[No. 2777.]

## Ex Parte A. J. Gilstrap.

1. HABEAS CORPUS—"PROOF EVIDENT."—See the statement of the case for evidence adduced in a *habeas corpus* proceeding under a charge of murder and held not to amount to "proof evident" that the accused was guilty of murder in the first degree; wherefore the refusal of bail was error.

2. SAME—EVIDENCE—PRACTICE—CASE STATED.—Upon the examination of the accused upon *habeas corpus*, most of the criminative facts were established by one C., a witness for the State.  The defendant proposed to prove by one B. that, immediately after the killing, C. said that he himself shot and killed the deceased, and that the deceased shot at him, C., three times.  Defendant further propounded to the witness B. the following question: . "Did you hear the witness C., a day or two before the killing of G. and C., say that he would make his son whip G.?"  This evidence was excluded by the court upon the objection of the State that no predicate for the impeachment of the witness C. had been laid, and as not being pertinent.  *Held*, error, inasmuch as no predicate was necessary to the admissibility of the rejected evidence; and because the defendant was entitled to any evidence tending to connect the witness C. with the offense.  See the opinion *in extenso* on the question.

HABEAS CORPUS, on appeal from a judgment in chambers, rendered by the Hon. T. B. Wheeler, Judge of the Twelfth Judicial District.

The applicant in this proceeding was held under an indictment charging him with the murder of E. Chifflet, in Nolan county, Texas, on the twenty-fifth day of February, 1883. He was refused bail by the judge below, and prosecutes appeal to this court.

The State first introduced the indictment, which was filed in the District Court on the twenty-first day of March, 1883.

O. J. Posey testified, for the applicant, that he lived in the town of Sweetwater, Nolan county, Texas, and was well acquainted with the applicant, A. J. Gilstrap. He had a distinct recollection of the killing of E. Chifflet and M. Guilliot. It occurred in the month of February, 1883, in the town of Sweetwater, in a saloon of which the deceased, E. Chifflet, was the proprietor, and the deceased, M. Guilliot, was the bartender. The witness was in the saloon at the time that the killing occurred. A great many persons were present at the time, some of whom were playing billiards. The E. Chifflet saloon was the most public establishment of the kind in the town, and was resorted to by a great many people. The difficulty which culminated in the killing of Chifflet and Guilliot occurred between seven and eight o'clock one Sunday night. If the applicant, A. J. Gilstrap, was in the saloon, or about there, at that time, the witness did not see him.

Cross-examined by the State, the witness said that he was in the saloon leaning on the pool table preparing to play a game of pool, when the shooting began. Witness and several others left when the first shot was fired. He did not see that shot fired, but saw the flash of the pistol, which was followed by several other shots. The witness went out of the house, leaving from six to ten men shooting. The larger number of these parties who were engaged in the shooting were standing between the northeast door and the bar, and by the side of the bar. The witness supposed that these men who did the shooting came into the house from the outside. There were four, five or six of them, none of whom the witness recognized. The witness supposed that he could have recognized them had he stopped to scrutinize them; but, as he did not consider that a particularly safe place to stop, he ran. He did not recognize the applicant as one of the party, and he did not think that, under the circumstances, he would have recognized him if he had been with the party. From six to ten shots were fired before the witness left

P

the house, and a number after he left—the witness did not know how many, as he did not undertake to count them.

The witness went out of the house at a door fronting south, near the southeast corner, and went off in a southwest direction. He did not return for ten or fifteen minutes. When, at the end of that time, he returned, he found the room full of men. Chifflet was lying on the floor, dead, with his head in the northeast door, the same door at which the shooting party came into the saloon. There were a number of bullet holes in his body. Guilliot was lying, dead, between the billiard table and the front wall. His head was towards the door in the southeast corner of the house. According to the recollection of the witness, Guilliot was shot through the back of the head.

Re-examined, the witness did not know how the firing began, further than that it commenced inside of the house. He did not know whether the first shot was fired by some one of the party who came into the saloon, or by some one of the inmates of the saloon. Guilliot was the bartender, and was behind the bar that night. If the witness had seen Gilstrap's face there that night, he would, he thought, have recognized him. He did not see Gilstrap.

A. Adams testified, for the applicant, that he lived in Sweetwater, and lived there at the time of the killing of Chifflet and Guilliot. The saloon kept by Chifflet was the most public establishment of the kind in town. It was a place of games, and was frequented by a great many people. It had a seven or eight foot gallery on both the east and south sides, and three doors on the east side. The witness was not at the saloon at the time of the killing, but was there that night from about three to five or six minutes before the killing occurred. He saw no pistols, nor did he see anybody about there have pistols. He heard Chifflet tell some one whom he did not know to go to Dulaney's and get two pistols he had left there. He was at the saloon as soon as the shooting was over, going there to see what was the matter. He knew A. J. Gilstrap well, but did not see him about the saloon either before or after the shooting. He had no idea how the shooting began. Chifflet owned the saloon and Guilliot was the bartender. Witness saw Guilliot behind the bar that evening, waiting on customers. He heard no threats by either Chifflet or Guilliot, nor anything of a sanguinary nature, except that Chifflet told some one to go to Dulaney's and get the two pistols.

Cross-examined by the State, the witness stated that, as he left the saloon just before the shooting, he saw four or five men in the street between the saloons of Chifflet and Gray. It was nothing unusual to see men standing in the streets, talking, as these men seemed to be. When the witness left the saloon he went to a tent in which a German kept a bakery, and was in the tent when the shooting took place.

W. B. Holloway testified, for the applicant, that he was in the town of Sweetwater on the evening that Chifflet and Guilliot were killed, but was not at the saloon when it occurred. Chifflet was the reputed owner of the bar, and Guilliot was the bartender. That saloon was as public a place as any in town, and was a common resort. The witness himself had been there several times, and generally found a number of men there. He was not present at the time of the shooting, and did not know what parties were engaged in it.

Cross-examined, the witness stated that Chifflet's saloon fronted the railroad depot on the main street leading to the depot. A hotel was kept in the second story of the same building. The hotel office, the witness thought, was on the same story with the saloon. He did not know the situation of the dining room. The saloon fronts south and east, the east being the main front, or, at least, having a larger number of entrances. The witness heard at least twelve shots fired—perhaps more. Witness at that time was fifty or sixty yards distant.

Lee Holloway testified that he was in Chifflet's saloon at the time the latter and Guilliot were killed. The witness knew the applicant, A. J. Gilstrap, well, but did not see him about the saloon that night. Quite a number of persons were in the saloon at the time, but the witness did not know how many. The saloon was a very public place, and it was nothing unusual for it to be crowded with men. As near as the witness can remember, the killing occurred about eight o'clock. The saloon was well lighted up. Chifflet was the reputed owner of the bar, and Guilliot was the bartender, and stayed behind the counter most of the time. When the witness last saw Guilliot, which was about the time the shooting commenced, he was behind the bar.

Cross-examined, the witness testified that the bar was situated on the north side of the saloon, near the front door, which led to the street. The witness was near the door fronting south, playing a game of billiards, when the firing commenced. He saw the parties who came into the house, and saw the flash and

smoke of the first pistol. He could not tell in what direction the pistol was pointed, nor did he recognize any of the parties. The man who fired the first shot was between thirty and forty feet distant from the witness, and about ten feet from the northeast door, near the bar. Witness could not tell whether the man was behind or in front of the bar. Two men came into the house when the first shot was fired. But three shots had been fired when the witness left the room, and all of these were fired near the bar. Witness saw but two men enter the house. He last saw Chifflet about the time the shooting began. He and Guilliot were both behind the bar at that time, Chifflet near the end of the bar, and next to the door. Witness's attention was first attracted to that point by a wrestling, as of some one struggling to get in at the door. Chifflet went to the door, the men came in, and Chifflet returned to his position behind the bar.

Witness did not know positively that he saw the flash of the first two of the three shots which were fired before he left the house. He did not know the men who came in, as, in facing the counter, they turned their backs to the witness. As the witness went out, he turned his head and saw the flash of the pistol when the third shot was fired, but did not see how it was pointed. Witness went out and walked westward, towards the office of the hotel, some thirty or forty steps.

Re-examined, the witness stated that the killing occurred on Sunday evening. The doors of the saloon were closed, but not locked. N. J. Dulaney was in the house, and nearer the firing than the witness was. He brought a pistol into the room with him, about one or two minutes before the firing began. He had it in his hand, and went with it in his hand towards the bar. The witness could not possibly tell whether the first shot was fired by Chifflet, Guilliot, or some one of the party which invaded the saloon. Dulaney came in at the south front door, four or five feet from where the witness stood. Witness did not know what he did with the pistol.

H. C. Hord, for the applicant, testified that he was in Sweetwater the evening of the killing. He did not, however, see the killing, and knew nothing about it.

Cross-examined, the witness stated that he saw the applicant at his place of business on that day, but had no conversation with him. Witness left the business part of town, and went to church about seven o'clock p. m. He saw the applicant about

five o'clock. It was possible—even probable—that he had a conversation with him, but if so, witness had forgotten what they talked about. He did not remember who, if any one, applicant was talking with when witness saw him. Witness saw Chambers, but could not swear that he saw Chambers and applicant in conversation. Witness saw Dick Gilstrap, applicant's brother, on the street, but could not say that he saw Dick and the applicant together. Applicant did not tell the witness, either before or after the shooting, that he knew the fight was inevitable before it came off. The applicant did not, after the fight, tell the witness that he knew Dick Gilstrap was going down to whip Guilliot. Dick was sitting down on the street, excited and mad, when witness saw him. He said that he had understood that Guilliot had sworn a lie on him. He had a stick in his hand at that time. J. C. Criner was talking with Dick in front of Douthit's drug store. Dick said that he had heard Guilliot had sworn that he, Dick, had fired a house, and that he intended to, or would like to, whip Guilliot. Applicant was then standing on the street, about fifty yards from Dick Gilstrap. About a dozen men were standing around. Witness left town a minute or two after this. He did not hear applicant say anything about Dick, either before or after the killing. Criner was the only person near Dick Gilstrap while witness was talking with him. The other men were some distance off, on the streets.

Doctor R. E. Moody testified, for the applicant, that he was and had been a practising physician since 1872. He graduated at the Medical College of Nashville, Tennessee. He had known the applicant since 1878, and had been his family physician since that time, and has had the applicant himself under professional treatment for three years. His ailment was first indigestion, which has since run into dyspepsia and palpitation of the heart. According to the witness's knowledge of palpitation of the heart, confinement in jail would imperil the life of any man subject to it, and would she ten his life. Close confinement would endanger the life of the applicant, in the opinion of the witness. Confinement or excitement would subject him to the peril of sudden death. Any manner of confinement would be dangerous to him. His skin does not now look so well, nor his eyes so clear, as when he was first put in jail. Among other physicians, Doctor Fields, of Fort Worth, examined him with the witness. Sound-

ing instruments were used, and his heart was found to be diseased.

Cross-examined, the witness stated that he first treated the applicant at Buffalo Gap. He had treated many cases of palpition of the heart, including several in Bosque county, but had never cured one that he knew of. Palpitation of the heart is caused by the contraction of the muscular fibers of the heart: blood flowing too freely into the valves of the heart. Witness had read Aken, Flint, Thompson and other writers on the subject, all of whom generally agree upon the causes of the disease, and all recommend a sedentary life for the patient. The advice of the witness to the applicant was to quit saloon business, or other business likely to excite him, and go on a ranch, where he would be active, but retired and remote from excitement. When witness first began to treat the applicant he drank, but, upon advice of the witness, he quit, and has not dissipated of late. He has continued in the saloon business, against the advice of the witness, and the consequence has been that his symptoms have grown worse. Saloon keeping and keeping late hours would necessarily aggravate the disease. Witness, like any other physician, is frequently mistaken in his professional opinion. On one occasion witness, under oath, expressed his opinion before the court, that one Gray could not with safety be removed from his bed under ten days or two weeks, and on the same day Gray got on his horse and left the country. Witness was mistaken in that case, and may be mistaken in this. He last examined the applicant in Fort Worth in the fall of 1882.

Re-examined, the witness said that since his examination by Doctor Fields the applicant had been taking physic from both Doctor Fields and himself. By "sedentary life" the witness meant "one free and retired from excitement; one in the country on a sheep or stock ranch, where he could fish and hunt and have proper diet and medicine." Witness had prescribed for the applicant since his arrest. He did not think his disease incurable if the valves of the heart have not been affected.

Re-crossed: When a patient has palpitation the pericardium may become contracted. The pericardium is a sack surrounding the heart and may contract. Hypertrophy may ensue, but witness has not said that applicant has disease of the heart. His palpitation is probably resultant from his dyspepsia, aggravated by his mode of life. Witness had prescribed nervous tonics; nux vomica, pepsine, malt peptine, lax peptine, arseni-

ous acid, quinine, bromide potassium, belladona, valerian, etc. An hour's exercise morning and evening would help the applicant considerably, but confinement, even with exercise, would, in the opinion of the witness, endanger his life.

Doctor D. N. Lee testified, for the applicant, that about two years ago he examined the applicant closely, and had him under professional treatment for a short time. Has not since had care of him, but has filled prescriptions for him at his, witness's, drug store, written by Doctor Windom, of Brown county. These prescriptions indicated his ailment to be the same as that for which witness treated him. Witness did not think the applicant a healthy, but rather a delicate, unsound man. He could not say that confinement would endanger his life, but thought that either marked excitement or close confinement might. Palpitation of the heart resultant from some causes is liable to produce sudden death. Palpitation is not a disease, but is the symptom of a disease.

Cross-examined, the witness said that he did not know what business the applicant had been engaged in, but had understood that for a time he kept a saloon. Whether such employment would injure one with palpitation of the heart would depend upon his conduct. Palpitation of the heart superinduced by dyspepsia, if the body be nourished by proper food, is not very fatal.

W. H. Cowan testified, for the applicant, that the applicant owned a homestead and some town property worth about two thousand dollars. Witness had understood that the applicant owned the saloon property near the depot, and had been engaged in the saloon business. Witness did not consider him wealthy. Here the applicant rests.

E. B. Weaver was the first witness sworn for the State. He testified that he lived in Sweetwater. He knew the applicant, and also knew Chifflet and Guilliot who were killed in the Palace saloon on the night of the last Sunday in February, 1883. The witness was in the saloon engaged in playing a game of billiards with George Moody and Lee Holloway at the time that the killing occurred. Some six or eight men came to the northeast corner door of the saloon, and some one exclaimed: "Hold up, boys, hold up!" On turning to look at two men who came in the door, the witness saw them have hold of a man he took to be Chifflet. They were standing before the bar and pulling Chifflet towards the door. Dick Gilstrap passed by the party

struggling near the door, and just then a firearm exploded, and the shooting appeared to become general. Dick Gilstrap had his arm extended in the direction of Guilliot, and the witness saw smoke issuing from the direction of his arm and hand at the time of the first shots. The shot that was fired when the witness saw Dick Gilstrap's arm extended towards Guilliot was the first shot that was fired that night. In the opinion of the witness the shots that followed were fired by the men who came into the saloon through the northeast door. Witness thought so then and thinks so now. They were fired from the direction of the door towards the bar. In a short time a man whom the witness took to be Guilliot ran towards the south door, and two or three shots were fired in that direction, from the direction of the northeast door.

After eight or ten shots had been fired in the house, three shots were fired from the west end of the bar to the west of the door at which the parties entered the saloon. Witness could only see the blaze of the pistols, and did not know who fired them. The house was full of men, there being some fifteen or twenty there during the night. Some were playing pool, and others standing around the stove, and still others were playing billiards. Some six or eight men entered at the door described. Most of the parties who were in the saloon when the firing began got out as soon as they could, and the best way they could. Nearly all of them went out at the south door. The witness remained in the house most of the time. Twenty shots at least must have been fired. The witness did not look to see who the two men were that came in the door and commenced the scuffle. He was not expecting a difficulty, and thought the scuffle was in play. When the shots commenced striking in the neighborhood of the witness's position behind a billiard table, the witness went out at the south door, and stood near the southeast corner, and looked in the direction of the northeast corner, to see if the parties would come out at that door, and if he could recognize them. They did not come out while the witness stood there. The witness then walked off southeast, towards the depot, when some five men came out of the northeast door of the saloon and walked off together up the street, towards the Central Hotel. One of these men crossed the street towards Gray's saloon. Witness could swear to none of them.

The witness saw John Chambers come from the direction of the door. A second or two after the shooting, Chambers jumped

off the gallery in a northeast direction, and, firing his pistol towards the saloon, said, as well as the witness could understand him: "Come out here, G—d d—n you, if you want to fight!" Chambers then went up the street in the direction the others went. He did not get off the gallery at the time, but after the others did, and went up the street after they did, and in the same direction. Witness then went into the saloon at the southeast door, and was the first man to go in after the shooting. He first went to Guilliot, who was struggling, and spoke to him, but received no answer. He then went to Chifflet and found him still alive. Witness then went behind the bar, but found no one there, and returned to the south door. Jim Caudle came in presently, and was the second man in the house after the shooting. Guilliot was lying near the east door in the center of the room, and near the wall. His feet were near or under the pool table. His position was about fifteen feet south of the northeast door, at which the parties entered. He was shot through the head from behind. He was shot in several other parts of his body. He had a pistol, which County Attorney Ragland took from his body. Chifflet was lying with his head in the northeast door and his feet towards the east end of the bar. The witness saw blood running from the back side of his head. He had no arms that the witness saw, though he looked about his person and on the floor around him for arms. Witness could not recognize the features of the men who did the shooting. He did not see the applicant there at all, though he might have been there and not been seen by the witness.

J. C. Criner was the next witness for the State. He testified that, when Chifflet and Guilliot were killed, he, the witness, was standing at or near the northeast door of the saloon in which the killing occurred. The actions of Dick Gilstrap late in the afternoon led the witness to believe that a difficulty between him and Guilliot was imminent. Guilliot had gone into a restaurant, when Dick Gilstrap walked from the opposite side of the street to the door of the restaurant with a stick in his hand. The stick was about three feet long, and about the size of an ordinary walking cane. Jack Gilstrap, the applicant, who is a brother of Dick's, stood at that time on the street about twenty steps from Dick, and in full view of him. Clayton, also, was about twenty steps off and in plain view. After Dick had stood at the restaurant door for some little time, the witness crossed over to him, spoke to him and said: "Come away, Dick, and

let him alone." Dick replied that he would "maul" Guilliot.
Dick was then within about eight feet of the restaurant. Ap-
plicant, who was standing on the same side of the street, did
not change his position. Dick was mad, and, the witness
thought, slightly intoxicated.

The witness did not hear the applicant say anything about the
difficulty that afternoon, but did hear him say, a day or two be-
fore, that if Dick did not whip Guilliot, he would. Witness
knew of a bad state of feeling between Dick Gilstrap and Guil-
liot, growing out of an affidavit made by Guilliot charging Dick
Gilstrap with firing a house which stood within a foot or two of
Chifflet's saloon. Witness talked to Dick Gilstrap one or two
minutes, and then went to his, witness's, stable, and remained
there for an hour or an hour and a half. From the stable, which
was west from the restaurant, the witness went to the saloon
kept by his son, near applicant's old stand. Witness stopped on
the sidewalk and saw a group of four or five men standing near
the front of Billie Gray's saloon, which was across the street and
towards the railroad from the witness. Witness heard one of
these men say: "Here are four of us who will see you out in it;
go down and maul him." The party then walked off down the
street, and the witness followed and went into the rear end of the
crowd. The party went in at the door of Chifflet's saloon, and
the witness halted on the gallery. As they went or rather
rushed in at the door, which was the north door on the east side,
the witness passed the door to another door and then returned
to the first door mentioned, stepped into it, and stopped, and
right at that time the firing commenced, and then and there the
witness saw the applicant in the saloon. He was standing near
the bar counter, eight or ten feet from the door, with a pistol in
his hand. Shooting was then going on in the house. The wit-
ness did not remember that he saw Guilliot at that time. Chif-
flet was between the applicant and the door. Other men were
standing around "promiscuously." Just as the witness opened
the door the shooting commenced, it seemed to him, in a volley.
Some of the men in the house were standing near the door, and
others in different parts of the house.

Billie Gray was in the saloon when the witness stepped up in
the door. He was standing on the left and near the edge of the
door. When the party went from the gallery into the saloon,
the witness recognized, among them, Billie Gray, John Cham-
bers and Dick Gilstrap. If the applicant went in with them the

witness did not see him. Others might have gone in whom the witness did not recognize. Witness saw another man go in, whose name he has not given. It was too dark for the witness to recognize the men when he first saw them in the street. The witness was wounded while standing in the door. He ran to about the centre of the street and fell. As he got up he saw some of the parties come out of the saloon. Among these he recognized Billie Gray, John Chambers, Dick Gilstrap and another man. The applicant came out last. Billie Gray passed the witness, going hurriedly towards his own saloon, and the others of the party went on up the street. When Chambers came out of the saloon, he fired his pistol in the air and exclaimed: "Come out on fair ground." It was too dark for the witness to see whether or not the parties were armed when they came out of the saloon. The witness did not see any arms in Chifflet's hands. Some one had Chifflet by the shoulder when the shooting began. Billie Gray was the only man the witness recognized as shooting in the house. Other shots than that which witness saw fired by Gray were fired in the house. The witness was not armed when he went to the saloon. He went there because he was afraid that his son was in the crowd, and he wanted to keep him from taking any part in a possible difficulty.

Cross-examined by the applicant, the witness stated that he employed counsel to prevent the finding of an indictment against himself for participation in this affair, and it was understood when he testified before the grand jury that he was to be exempt from indictment. Witness was sworn upon the inquest and his testimony was reduced to writing. The witness's son Alfred left during the first week of court and the witness did not know his whereabouts. Witness did not advise him to leave; did not know why he left, nor whether he left before or after the witness testified before the grand jury. Alfred was at the witness's house but one or two days after witness was wounded. He came but once afterwards. The witness was with the crowd that went to the saloon. He followed with the crowd, but did not remember with whom, if any one, he walked. He did not know, but suspected that evening that the fight was coming off. Witness knew that his son and Guilliot were "at outs," and had heard that Guilliot had charged his son, in connection with Dick Gilstrap, with firing the house.

The witness stepped into the saloon door alone and went from

the saloon alone. Just as the witness stepped into the door he saw the applicant standing near the bar in the saloon, with a pistol in his right hand, and it was just at this time that the firing began. Witness could not tell whether Chifflet, Guilliot, or other parties fired the first shot, but knew that the first shot was fired in the house. Doctor Talliaferro treated the witness after he was wounded, and Doctor Moody was also called in. Witness asked Doctor Moody if he was at witness's house on the morning after the difficulty, and he said that he was. Witness then asked him to make an affidavit as to whether or not the witness was then under the influence of morphine. Witness did not see the applicant shoot in the saloon, and, if he was one of the party who went into the saloon at the time referred to by the witness, witness did not recognize him.

The witness was examined before the coroner's jury, and was not at that time under the influence of morphine. He would have changed his testimony before the grand jury if he had had no counsel, and if he had not been shot, because he thought it right and just that he should, and that the grand jury were entitled to the facts in the case. The witness admitted that he dreaded an indictment, because he was afraid that some one might have mistaken him for some one else, and because he feared that, in talking to Dick Gilstrap on that afternoon, he might have created some suspicion against himself. The witness had no other reasons for changing his testimony, and was in no way influenced by his son's connection with this matter. Witness had never been arrested in this matter, nor, so far as he knew, indicted. The written testimony of the witness, taken before the coroner's jury, signed by the witness, and attested by J. T. Bradley, was read to the witness, who stated that he he did not know whether or not that was his testimony, or whether he testified as written before the coroner's jury.

Re-examined by the State, the witness said that if the writing purporting to be his evidence before the coroner's jury was really a record of what he testified on that occasion, it was wholly untrue. The statements now made by the witness are true. When the witness appeared before the coroner's jury he was wounded, was suffering great pain, was under the influence of morphine, and was afraid of Billie Gray, who was present and the witness thinks was one of the coroner's jury. Witness believed then and believes yet that if he had then told the truth his life would have been in danger.

N. J. Dulaney was the next witness sworn for the State. He testified that he was present when Chifflet and Guilliot were killed. The witness had been in the house not above a minute when the parties came in. He had started out at the south door of the east end of the room when the parties came in. Dick Gilstrap came in first, with his face turned directly towards the witness. Witness was then between Dick Gilstrap and the stove, and could have touched his arm almost. As Dick Gilstrap stepped into the saloon, Chifflet laid his hand on his arm and said: "Dick, begone! Don't come into my house." Dick had just stepped in and had not then advanced the width of the door. The other parties who followed Dick in then caught Chifflet, and tried to drag him out of the saloon. When they had dragged him to the door Chifflet braced himself against the closed half, and the crowd did not get him out. As Chifflet pulled himself back the crowd followed him in, and about this time Dick Gilstrap advanced from the door to the far end of the bar, and the shooting began.

At this time the witness was standing near the pool table, some six or seven feet from the door and about eight feet from the bar. The men who came to the door had revolvers in their hands, pointing in at the door, and the witness cried out: "Men, put up your pistols; don't have any trouble; put up your pistols." The witness saw four pistols pointing in at the door. This was just as Chifflet pulled himself back into the house, and about the time that Dick Gilstrap passed Chifflet. Chifflet had no pistol when he put his hand on Dick Gilstrap's shoulder and told him to leave the house. The shooting commenced from the point where Dick Gilstrap was standing. The witness saw the blaze of the pistol, but did not see Dick shoot. That shot and the shots from the crowd were so near simultaneous, the witness could not tell which was fired first. Dick Gilstrap was then standing near the end of the bar. The shooting, after the first shots, divided into three sections, one from near the door, one about the center, and the other at the end of the bar. Most of the persons originally in the saloon had run out. The witness had started out and had reached a point near the south door. After the first shots the witness could not tell from what particular direction any of the succeeding twenty-five or thirty shots were fired. Witness did not go out at the south door, because the bullets were flying in almost every direction, and he con-

cluded that it was about as comfortable to be shot in front as in the rear.

The witness did not see Chifflet after the first volley was fired at the door, but saw Guilliot as he fell. He was then running from the far end of the bar, near the door, around the table and in the direction of the door near which the witness was standing. He fell near the northeast corner of the pool table, twelve or eighteen feet from where the witness was, and twenty odd feet from the bar. He was running from the bar towards the south door when he fell. Witness could not tell from what point the shots came that struck Guilliot. One, the witness thought, came from the far end of the bar, and the others from the door and the center of the bar. The last shot that was fired in the house, just as Guilliot fell, struck the witness, who then limped out at the south door and into the hotel office. The parties had all left the saloon when the witness went out. The witness took no part in the fight, and did not go back to see the bodies of the killed.

The witness had an empty pistol under his arm when he was shot. He had started to church with a drummer, and met Chifflet, who asked him if he had a pistol, saying that Guilliot had gone, and had taken the only pistol about the saloon; that he had to go home, and that Charley did not want to stay in the house without a pistol. The witness went and got the pistol and took it to the saloon. Witness had just received it from the factory, and it had never yet had a cartridge in it. Several parties examined and snapped it, and saw that it was not loaded. The four revolvers that were pointed in at the door did not include the pistol held by Dick Gilstrap. Dick was in the house at that time. Chifflet had no pistol that the witness saw, nor had the witness, who knew him intimately, ever seen him with a pistol at any time. Witness did not see Guilliot when Chifflet asked for the pistol. When he first saw Guilliot that night he was running from the bar near where Dick Gilstrap had stopped.

The witness could not tell who the men were that came to the door and pointed their pistols into the saloon. They came into the house with their backs towards the witness, and it was impossible to recognize them. Witness was not expecting a difficulty when he first went into the saloon. He did not see the applicant in or about the saloon, and thought that if he had been there he, witness, would have seen him, as he saw everybody that was there. The stove was sixteen or seventeen feet

from the east end of the building, and six or seven feet from the back end of the bar. The back end of the bar was about sixteen or eighteen feet from the door at which the parties came into the saloon. All the parties whom the witness saw at the door with pistols came into the saloon. There were as many as four followed Dick Gilstrap into the house. The lights in the room were dimmed by the smoke, which made it difficult to distinguish persons in the house. The first intimation that the witness had of a difficulty was the dragging of Chifflet to the door, and the appearance of the parties at the door. The only words spoken were those of Chifflet when he told Dick Gilstrap to go out of the house, and by the witness to the men to put up their pistols. The first shot from the back end of the bar wa ⋅ fired in a north or northwest direction.

J. L. Clayton testified, for the State, that he saw Chifflet and Guilliot at the Palace saloon after their deaths. Witness was at home, two or three hundred yards from the saloon, when the killing occurred. He saw the applicant and Dick Gilstrap about sundown on the evening of the killing. Dick Gilstrap was then in front of the restaurant in which Guilliot was at that time. Dick had some kind of a stick in his hand, but the witness saw no weapon about him. The witness saw the applicant and Dick Gilstrap together that evening, but he did not remember where. A great number of men were on the street that evening. He thought the two Gilstraps were together in front of the restaurant, as they left that vicinity together. Witness heard Dick Gilstrap say something about Guilliot or some one swearing something on him, but did not understand exactly what. He appeared angry over the matter of which he was talking. This was about a half hour before the shooting. Witness did not know where the applicant was while Dick was talking about Guilliot having sworn something on him. Dick Gilstrap and the witness were then in Criner's saloon. Witness had talked with the applicant about this case. Jack Gilstrap and Dick Gilstrap are brothers, and were often together.

J. E. Warren testified, for the State, that he saw applicant and Dick Gilstrap together on the day of the shooting. Applicant was going up the street to a house near the tin shop. Dick was standing near the house with a stick in his hand. Applicant stopped when he reached Dick. This was between sundown and dark, before the shooting. Witness did not hear the shooting.

C. E. Ray, for the State, testified that he heard the shooting and saw Chifflet and Guilliot after they were killed. The witness had just passed the saloon corner, and was on the south gallery when the shooting commenced. As he passed down the street on the east side of the saloon, some six or eight men, who had been standing in a bunch in front of Billy Gray's saloon, came on down the street behind him. They came towards Chifflet's saloon, and were thirty or forty, or perhaps fifty, yards from Chifflet's saloon when the witness last saw them before the shooting occurred. Just after witness turned the corner, and two or three minutes before the shooting began, witness heard men step up on the gallery. Witness was in the office door at Dulaney's hotel, west of the saloon and in the same building, when the shooting occurred. Not less than fifteen shots were fired.

William Wetsel testified that he was in the Central Hotel when the shooting occurred at which Chifflet and Guilliot were killed. Some fifteen or twenty minutes before, witness was in Billie Gray's saloon and saw a party of four, five or six men going down the street in the direction of Chifflet's saloon. He did not see them when they got to Chifflet's saloon. Among these men the witness recognized Dick Gilstrap and John Chambers.

County Attorney Ragland testified, for the State, that he was in the office of the Central Hotel at the time that the killing occurred. He went to the saloon after the shooting was over, and saw the bodies of Chifflet and Guilliot. Guilliot was lying on his side. Witness did not remember whether Guilliot's coat was buttoned or not. He had a pistol on his person. It was lying on his body, muzzle upward, barrel outside and rammer inside of his vest. Witness called the attention of Weaver to the pistol and then picked it up. He attempted to see whether or not it had been discharged, but the pistol was a peculiar one in its mechanism and witness did not understand its workings, so he gave up the attempt and put the pistol in his pocket until Justice Scarborough arrived, when witness turned the pistol over to him. It had undergone no change in the witness's hands, and was touched by no one but the witness as long as he had it. Witness saw the wound in Guilliot's head. The ball entered in the rear and came out in the front and top of the skull. Witness was present at the inquest. He "considered the times squally." He examined the saloon after the shooting,

and found that one or two shots passed the southeast door, one passed into the wall near the door higher up, two through the east door on the south side. There were three at the south door about three feet apart, which appeared to have been fired from the direction of the bar. There was one shot in the side of the pool table and one on the front side of the bar.

J. B. Scarborough, justice of the peace, testified that he did not hear the shooting. Chifflet and Guilliot had been killed some fifteen or twenty minutes when the witness got to the saloon. County Attorney Ragland gave the witness a pistol of peculiar manufacture, of which five chambers were loaded and one empty. There were two mortal wounds on the body of Guilliot; one entering the back of the head and coming out on top and in front of the centre of the head, and the other just above the left nipple, ranging slightly downward towards the shoulder joint. Chifflet had a wound just in the rear of his right ear, the ball ranging slightly upward and lodging somewhere in the front part of the head.

Cross-examined, the witness stated that he acted as coroner, and held the inquest over the bodies. J. C. Criner was sworn as a witness on that inquest. Witness identified the writing shown him as the testimony of Criner, reduced to writing at the time. It was here read in evidence and is as follows:

"Mr. James Criner, being sworn, says: The first I knew of the firing, I started to go into the saloon at the east door. I met Mr. Chifflet with pistol in his hand, and he shot me. He fired three shots at me. I knocked the pistol aside each time to save myself. I know no other party who did any shooting. Two shots were fired at me after I left the door and started up the street. The last I saw of Mr. Chifflet he was falling.

"(Signed)          JAS. CRINER."
"Witness: J. T. BRADY."

Re-examined, the witness said that Criner was at home wounded, and in bed, when he testified before the coroner's jury, which was on the day after the killing. He seemed to be suffering very much. The witness knew nothing of any medicine he had been taking, nor did he remember that Criner said anything about any medicine he had been taking. The jury of inquest was composed of J. T. Brady, N. C. Bawcom, W. Mc-Clintock. Jep. Clayton, David Taylor and Billie Gray. Witness

was present as justice of the peace. He remembered no other persons present. There was quite an excitement in town after the homicide. At the time, and under the circumstances surrounding the community, the enforcement of the laws was difficult.

Lee Halloway, being recalled, stated that, five or six days after the killing, the applicant told him, in the course of a conversation, that Chifflet fired the first shot at his brother, Dick Gilstrap, and he thought at the time struck Dick in the breast. Applicant did not state that he was present, nor did the witness ask him. He did not say where he was at the time.

Cross-examined, the witness said that he saw a hole in Dick Gilstrap's coat sleeve. Dick was wounded in the leg. Witness did not know who shot him. Witness had not seen Dick Gilstrap for two weeks before the shooting. He was not then wounded. He was wounded as stated when witness saw him after the shooting.

J. T. Bradley testified, for the State, that he heard the testimony of the applicant delivered before the coroner's jury, and identified the writing offered in evidence as a correct record of what he testified in that proceeding. It reads as follows:

"A. J. Gilstrap, being sworn, testified as follows: That he was standing on the platform or gallery in front of Chifflet's saloon. Mr. Chifflet was standing between Dick Gilstrap and the door when the firing commenced. Guilliot came around from behind the bar in the rear of Chifflet, and fired at Dick Gilstrap, and I think the ball hit Dick Gilstrap. I think that about that time Chifflet shot at some one. The party that Chifflet shot at was outside of the door. I think that the shot that killed Chifflet was fired from behind him, and was the second shot fired. Chifflet fell at about the second or third shot. Have no idea how many shots were fired. After Guilliot shot at Dick, I saw Dick pull out a pistol, but there was so much smoke I could not tell whether or not he fired. There were several shots fired in succession, and I think two or three shots were fired from the outside. I did not recognize any of the parties on the outside.

" (Signed)                              A. J. Gilstrap."

E. B. Weaver, recalled by the State, testified that when he stood looking around the corner at Chifflet's saloon to see if

anyone came out of the saloon, he saw no one standing on the gallery. The shooting was then going on in the house, and if anyone had been standing on the gallery, the witness would have seen him.

Crossed by the applicant, the witness said that he was looking around the corner after the shooting began. He saw nothing of Jim Criner standing outside near either one of the doors, and could have seen anyone standing outside near those doors. He could not have seen a man standing in the door. Witness was in the house when the shooting began, and did not look to see who, if anyone, was on the gallery at that time.

Joseph Atwood testified, for the State, that while he was sitting in front of the stove, with his back to the northeast door of Chifflet's saloon, he heard a noise at the door, and turned and saw Chifflet pushing some one out of doors. He heard four or five shots from the door, and stooped behind the stove. One ball grazed his hat brim. Chifflet was at the door looking out when the shots were fired. Guilliot was near the barrels behind the bar when the firing began. Witness did not see either Guilliot or Chifflet with a pistol during the time of the shooting. He recognized a pistol shown as one owned by Guilliot and usually kept behind the bar. He saw no pistols displayed by the parties who entered the saloon. He was certain that the first shots were fired from the outside. Had they been fired from behind the counter or near the witness, witness would have known it. Many shots were fired in the room, but the witness could not tell by whom or from what points.

The State having rested at this point, the applicant resumed his testimony, and introduced G. W. Moody, who testified that he was in Chifflet's saloon when the shooting commenced, playing a game of billiards with Weaver and Lee Holloway. After the second shot was fired, the witness went out of the house at the south door. He was the first man to leave the house. He turned the corner and went towards the depot. Seven or eight shots, as near as the witness could judge, were fired after he went out of the house. The witness, when he went out of the room, saw the applicant walking up the east gallery going from the point where the witness was, in the direction of the east door. He was between the two doors walking slowly from the witness. He was not in the house when the witness saw him. He had no weapon in his hand, or the witness, who was within five or six feet of him, would have seen it. The witness then

ran to the ditch near the railroad, and when he reached the ditch the shooting was about over.

Cross-examined by the State, the witness repeated that he was the first to get out of the saloon when the shooting commenced. He went out in a "sort of a trot," and trotted to the depot before he stopped. Applicant was within five or six feet of the southeast corner of the house, and when the witness last saw him was walking along slowly, showing no excitement. The witness looked at him as he went along until he got off the gallery, but did not stop. His face was not turned towards the witness. He had on a gray coat, such as he wore on this proceeding, and a white hat. Witness recognized him by his walk and his suit of clothes. Witness had never told anyone about seeing applicant on the gallery until to-day, when he told counsel in the case. He told Mr. Koen this: "I did not see Billie Gray there. I saw other men there whom I thought I knew, but would not swear to them positively. This was on yesterday." John Aston was present when witness made this statement to Koen. Witness told Doctor Moody that he thought Dick Gilstrap and old man James Criner were the first men he saw enter the house. Weaver came out of the house after witness did. Witness was not positive, but still thought Dick Gilstrap and old man Criner were the first men he saw enter the house.

L. G. Lockhart testified, for the applicant, that he, his wife and brother passed Chifflet's saloon about dark on the night of the killing, going to church. He saw two men on the opposite side of the street and about eighty feet from the saloon. Witness took one of these men to be the applicant, whom he had known for many years. He had no idea who the other man was. Witness passed them at a distance of fifteen or twenty yards, and saw some more men about fifty yards distant, none of whom he recognized. There were five or six in the crowd, and they were going somewhat in the direction of Chifflet's saloon. The shooting commenced within two or three minutes after the witness had passed this group.

Crossed by the State, the witness said that he saw these groups of men about dark. He would not assert positively that it was the applicant he saw, but he thought then that it was and still thinks so. The witness was in front of Mr. Simpson's store when he heard the shooting. He went on to church and found that services had begun before he arrived. He remembered the names of no one he saw at church that night. The witness was

not taking an active part in the defense in this case, and did not ask to be called as a witness.   He was on the bond of J. M. Chambers, but not on that of the applicant.   He had told two or three persons about meeting the crowd of men, and had, on the day of this proceeding, told Tom Gilstrap that he thought it was the applicant he saw in the street that night.   Witness had not interested himself looking up evidence in this case.

B. M. Aston testified, for the State, that he was at church when the killing of Chifflet and Guilliot occurred, and heard the shooting.   The witness knew L. G. Lockhart, but did not know his wife.   Just before the shooting a man whom the witness took to be Lockhart came into the church with a lady and child. No one whom witness took to be Lockhart came into church after the shooting occurred.   Mr. Musgrove and Mr. Hood were sitting near the parties whom the witness took to be Lockhart, wife and child.   Witness recognized the man as Lockhart, but was not positive that it was.

R. A. Musgrove testified, for the State, that he was at church on the night of the killing, and thought he heard pistol shots, at which time Judge Aston looked out of the window.   Lockhart was then sitting in front of the witness.   He, Lockhart, was in church when the witness thought he heard pistol shots, and was there when Mr. Scarborough left the church.

L. F. Otey, for the applicant, in rebuttal, testified that immediately after the shooting he met a man, woman and child about fifty yards east of Simpson's store, going up the street.   Witness did not know Lockhart, but knew that the lady he met with him was Mrs. Lockhart.   They were going in the direction of church.   The shooting then was all over.   Witness was a very particular friend to the defendant.   On the next morning Lockhart told the witness that he was the man with Mrs. Lockhart.

*Lanham & Stephens,* for the appellant:   Bail is sought in this cause on two grounds: the absence of "proof evident," and the physical condition of the applicant, under Article 155, Code Criminal Procedure.

It is respectfully insisted that the court erred in refusing the applicant bail, upon both the grounds above mentioned.   It is shown by the testimony of the witness Doctor R. E. Moody that any confinement of the petitioner, even though intermixed with exercise, would endanger his life.   The testimony of Doctor D. N. Lee, while not predicated upon the same familiarity with the

disease of petitioner as that shown by Doctor Moody, is nevertheless supportive of the statement of Doctor Moody; and the evidence of the two taken together, it is respectfully submitted, make out, to say the least, a *prima facie* case for relief under said Article 155, Code of Criminal Procedure. There is no counter evidence introduced by the State upon this feature of the case, and the testimony of said medical witnesses is in no respect attacked or controverted.

We maintain, upon the entire evidence, that the record fails to show that "the proof is evident" that the defendant is guilty of a capital offense, or that the evidence is "clear and strong" that the petitioner is guilty of murder in the first degree. (41 Texas, 213; 5 Texas Ct. App., 625.)

If the testimony of J. C. Criner, a witness for the State, be eliminated from consideration, there is certainly no criminative testimony as against this petitioner that would, for a moment, pertinently identify or connect the petitioner with the commission of the offense, and the case would be similar in its legal effect to that of *ex parte Bomar,* 9 Texas Court of Appeals, 610. Each and every circumstance detailed by any and all of the other witnesses, so far as they affect or refer to appellant, may be accounted for consistently with his innocence or lack of participation in the homicide. Nearly all of the witnesses who testified stated that they were well acquainted with applicant; many of them were in the saloon at the time of the homicide, and not a single witness, except Criner, testifies that he was in the saloon. No other witness ever heard him say anything against either one of the deceased men; no other witness saw him with a weapon. No conspiracy or co-operation of act or sentiment with the parties who did the killing is shown against this appellant by any of the rest of the State's witnesses. We think it is clear that, leaving Criner's evidence out, the court would not hesitate to grant him bail.

Who, then, is Criner, and what is his attitude in the case? We think it is manifest that he is an accomplice. He feared an indictment against himself; he employed counsel to prevent himself from being indicted; he testified before the grand jury with the understanding that he was to be exempt from indictment; he admits that he swore falsely before the coroner's jury and afterwards changed his testimony; he attempts to justify his falsehood by saying that he was under the influence of morphine, and also that he was afraid of Billy Gray—two wholly

inconsistent reasons, and which will not stand together. His testimony before the coroner was an attempt to justify himself, and shows that his motive was to clear his own skirts. By his own testimony he shows that he is an accomplice. Then he was recognized by witness Moody as one of the first men to enter the saloon. Suppose the case were on final trial, would not the issue of his being an accomplice have to be submitted to the jury? The witness Bawcom was asked if Criner did not say that he had killed Chifflet, for the purpose of showing, still more affirmatively, that he was an accomplice. The court refused to allow the witness to answer.

Wherein is Criner corroborated? No one else heard appellant say anything against the deceased; no one else testified of any guilty knowledge of or participation in the transaction by A. J. Gilstrap; no one else testified that he was in the saloon or had a weapon; others who were present and knew A. J. Gilstrap say that if he was in the room they did not see him. Does Criner's testimony make anything evident? Is it supported in any of the essential statements? (See *Dubose* v. *The State*, 10 Texas Ct. App., 230; *Weldon* v. *The State*, Id., 400.)

Do any of the facts stated by the other witnesses in the case "point pertinently to the defendant as the guilty party, or as a participant?" (*Weldon* v. *The State*, 10 Texas Ct. App., 401.) Then we submit that, taking Criner's testimony in its full scope and granting it credence, it does not even then make a case of murder in the first degree against this appellant. Criner does not say that appellant participated in the killing, or that he went into the saloon with the other men. He says appellant had a pistol. The same might be said of Dulaney or any other witness, and still not make out a case of murder in the first degree.

We submit that, if Criner's testimony be blended with that of the other witnesses, and the whole be taken together, it does not make out such a case as to warrant the refusal of bail. The appellant himself testified before the coroner's inquest, and stated that he was on the outside of the saloon on the gallery. This does not amount to anything against him when taken in connection with all the facts. There were many persons present. The saloon where the homicide occurred was a place of frequent resort. This does not show that he went there for any unlawful purpose. He did not go there with the group of men, evidently, as shown by Lockhart's testimony. Does it follow, because he was on the gallery, according to his own statement,

that he was there under such circumstances as to constitute him a principal?

Another view of the case we desire to present is this: Suppose the parties who went to the saloon of the deceased went there to have a fight or to "maul Guilliot," not intending to commit a murder, and suddenly became engaged in a deadly encounter caused by Guilliot or Chifflet firing upon them, would it make a case of murder in the first degree? One barrel of Guilliot's pistol was discharged. It is left in doubt as to who fired the first shot. If this appellant, being on the gallery, had seen Guilliot shoot at his brother, and had even then participated in the shooting (which is not shown), would it be a case of murder in the first degree? If he had gone with the crowd to see a fight between others, would that make him guilty of murder? The State not only failed to show that A. J. Gilstrap, this appellant, was in the crowd who went to the saloon, or knew and participated in the intent to murder the deceased, but the testimony for appellant shows that he did not go with them.

In view of the entire testimony, as well as the physical condition of the defendant, we respectfully submit that the appellant is entitled to his reasonable bail.

*J. H. Burts*, Assistant Attorney General, for the State.

Hurt, Judge. Appellant was indicted for the murder of E. Chifflet at the March term, A. D. 1883, of the District Court of Nolan county. He sued out the writ of *habeas corpus*, which was heard by the Hon. T. B. Wheeler, in chambers, on the twentieth day of April, 1883, and bail was refused, the appellant being remanded to the custody of the sheriff. From this order of the judge below this appeal is prosecuted.

Two grounds were relied on for bail before his honor below, and are here insisted upon:

1. That applicant's health would be endangered by imprisonment. (Art. 155, Code Crim. Procedure.)

2. That the proof is not evident.

The first ground is not supported by the evidence.

Second ground: Is it evident from the proof that applicant is guilty of murder in the first degree?

We are of the opinion that it is not. We think that it would be improper to enter upon an analysis of the facts and circumstances by which the *proof* is sought to be made evident. As

this cause will have to be tried by a jury upon its merits, we deem it necessary for us to notice the question presented in the bill of exceptions.

James Criner was the most important witness in the case. By him most of the criminative facts were established. The applicant proposed to prove by one N. C. Bawcom that immediately after the killing of Chifflet, he, Bawcom, heard Criner say that he himself had shot Chifflet, and that Chifflet had shot at him, Criner, three times. Counsel for applicant also propounded a question to the following effect: "Did you hear the witness Criner, a day or two before the killing of Guilliot and Chifflet, say that he would make his son Alfred whip Guilliot?" Upon objection of the prosecuting attorney this evidence was excluded upon the ground that no predicate had been laid for the impeachment of the witness, and upon the further ground that the question and answer were not pertinent to the cause.

Was a predicate necessary? By no means. Criner being a witness, applicant had the right, without predicate, to introduce any fact or circumstance tending to connect him with the crime, which would be admissible if Criner himself had been on trial.

The reason is evident. A conviction cannot be had upon the testimony of an accomplice unless corroborated. Hence the fact, viz., accomplice or not, is of the highest importance. If shown to be an accomplice, the attitude of the case is radically changed. Stamp upon the witness this character, and, whether corroborated or not, the jury might not be inclined to believe him. Again: the necessity of corroboration arises; which would not be required if not an accomplice, and the strength or cogency of the corroborating facts become the subject of investigation, requiring the closest scrutiny. Each of these, and perhaps other questions, are made important matters of investigation, when a witness is shown to be an accomplice. We are of the opinion that the evidence offered was of the first importance under the facts of this case, and should be admitted.

Because the proof is not evident that applicant is guilty of murder of the first degree, the order remanding him to the custody of the sheriff is reversed. It is therefore ordered and adjudged by the court that the applicant A. J. Gilstrap be admitted to bail in the sum of five thousand dollars, with good and sufficient sureties, and that this judgment of the court be certified to the sheriff of Nolan county, the officer having custody of said

applicant, who is authorized and empowered to receive a bail bond for that amount, properly executed and conditioned as the law requires; which said bail bond, when so executed and approved by said sheriff, shall be filed by him in the District Court of said county.

*Reversed and bail awarded.*

Opinion delivered May 26, 1883.